IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICK VASNAIK,

          Plaintiff,

    v.

PROVIDENCE HEALTH & SERVICES–
OREGON, an Oregon corporation, d.b.a.
ST. VINCENT MEDICAL CENTER,

          Defendant.

No. 3:14-cv-00027-HZ

OPINION & ORDER

Thomas K. Doyle
Bennett Hartman Morris & Kaplan, LLP
210 S.W. Morrison Street
Suite 500
Portland, OR 97204

       Attorney for Plaintiff


Janine C. Blatt
Jeffrey J. Druckman
Druckman & Blatt, PC
0424 S.W. Iowa Street
Portland, OR 97239

       Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Patrick Vasnaik brings this employment discrimination action against his former employer, Defendant Providence Health Services, d.b.a. St. Vincent's Medical Center ("Providence"). Mr. Vasnaik claims Providence subjected him to heightened and unwarranted scrutiny because of his age and a series of work-related injuries. His complaint originally alleged race, national origin, age, disability, and injured worker discrimination; he voluntarily dismissed the race and national origin claims.

Currently before the Court is Providence's motion for summary judgment on his remaining claims. Providence asserts that Vasnaik's termination resulted from repeated policy violations, culminating in a written warning for three serious incidents and subsequent termination when he violated Providence parking rules he was charged with enforcing.

Vasnaik fails to establish a prima facie case for either age or disability discrimination, and Providence's motion for summary judgment on those claims is granted. He does, however, raise the possibility that Providence's reasons for terminating him could have been a pretext for discriminating against him because he invoked the workers' compensation system. Accordingly, Providence's motion for summary judgment on Vasnaik's ninth claim for relief is denied.

## BACKGROUND

Vasnaik worked as a security officer for Providence from July, 2006 through his termination in September of 2012. Compl. ¶¶ 10, 19. He was born in October of 1945, and was sixty-six years old when was he was fired. Doyle Declaration ("Decl.") Ex. A, ECF No. 28-1, at 1; Compl. ¶ 30.

During his approximately six-year stint at Providence, Vasnaik received annual performance evaluations. Doyle Decl. Exs. H–L, ECF No. 28-8–28-12. His performance ratings

fluctuated generally between "meeting some expectations" (or "requiring improvement") and "exceeding expectations." Id. Of note, he exceeded expectations in the "Attendance and Punctuality" category several times." Doyle Decl. Ex. H, ECF No. 28-8, at 9; Ex. I, ECF No. 28-9, at 9; Ex. K, ECF No. 28-11, at 2.

In addition to the formal evaluations, Vasnaik received both positive and negative feedback on his performance. In July 2011, Allen Mullen, Manager of Providence's Department of Security Services, received a "packet of thanks" for Vasnaik and another security officer. Doyle Decl. Ex. N, ECF No. 28-14. Vasnaik earned a "Message of Thanks for the Support" from another department at Providence for participating in a training video regarding lost patient property. Doyle Decl. Exs. O–P, ECF Nos. 28-15–28-16.

Although he received high marks for attendance at his annual reviews, Vasnaik's supervisors occasionally coached him on attendance and punctuality. He was coached in March of 2010 about the need to arrive to work on time and be prepared to take over his assigned post at the start of his shift. Defendant's Motion for Summary Judgment ("Def. Mot.") Ex. 30, ECF No. 19-21. In May of 2010, Vasnaik received what Providence calls a "documented coaching" from his supervisor Steve Wilson after he accumulated two tardies and three absences in a rolling 12-month period, the maximum allowed under Providence policy. Vasnaik Deposition ("Depo."), ECF No. 19-1, at 32–35; Def. Mot. Ex. 13, ECF No. 19-11. He received a written warning in May 2011 in part because of a "No Show/No Call" earlier that month. Def. Mot. Ex. 30, ECF No. 19-21.

Vasnaik's supervisors also coached and counseled him for errors on the job and when he violated Providence's employee policies and procedures. For instance, one of his duties as a security officer was to record and secure items found on hospital property. Def. Mot. Ex. 8, ECF

No. 19-8, at 1. Vasnaik twice received a documented coaching for violating lost and found procedures: once in 2010 after he mistakenly took home a lost wallet he had placed in his pocket and forgot to log, and again in 2011 when he erroneously informed a woman her lost necklace was found, much to her disappointment. Vasnaik Depo., ECF No. 19-1, at 28–32, 36–38; Def. Mot. Exs. 10, 18, ECF No. 19-10, 19-18.

Another part of Vasnaik's job was to park patients' vehicles if the patient was taken into the hospital immediately because of his or her condition. Vasnaik Depo., ECF No. 19-1, at 40–41. In February 2011, Vasnaik parked a patient's vehicle in a designated disabled space without the required permit; the patient received a $300 ticket, and Vasnaik received a written coaching from Wilson. Id. at 40–44; Def. Mot. Ex. 19, ECF No. 19-14.

Vasnaik was also coached on (1) radio communications and emergency room standby procedures, Def. Mot. Ex. 3, ECF No. 19-3; (2) relieving other officers from their posts in a timely manner, Def. Mot. Ex. 4, ECF No. 19-4; (3) working with other departments, Def. Mot. Ex. 30, ECF No. 19-21, at 2; and (4) proper radio use and responding to radio calls, Vasnaik Depo., ECF No. 19-1, at 66–67; Def. Mot. Ex. 34, ECF No. 19-24.

One criticism of Vasnaik's work came up repeatedly in his annual evaluations and through other coachings: he struggled to properly prioritize security calls or respond to emergency situations with sufficient urgency. His 2009 annual review stated that Vasnaik "could use a little work in prioritizing calls he responds to . . . ." Doyle Decl. Ex. J, ECF No. 28-10, at 11. He was not answering officer calls when eating his lunch, and Wilson "had to again explain to him that we are subject to call at any time." Def. Mot. Ex. 1, ECF No. 19-2, at 6. Wilson completed Vasnaik's 2010 review in September of that year, and provided comments for several areas where Vasnaik's performance rated as "Requires Improvement":

- "Patrick needs to be a little more focused on the priority calls. He appears to have one speed in which he does everything and there are those occasions where we need to shift gears and pick up the pace. The safety of co-workers may depend on it." Def. Reply, Ex. 17, ECF No. 32-6, at 4.

- "He needs to speed up his pace on calls requiring a higher priority level . . . . Any stat officer assistance call takes priority followed closely by any emergency code call. The pace needs to be picked up and not casually walk to the call." Id. at 11.

- "When an officer calls for assistance, do not take your time getting there. You need to pick up your pace . . . . When responding to an officer assistance call, drop what you are doing and immediately respond . . . ." Id. at 14.

Criticism of Vasnaik's performance in this area continued in January of 2011: "Patrick responds to all situations at one casual pace. I explained to him the importance of picking up the pace for any emergency call . . . ." Def. Mot. Ex. 1, ECF No. 19-2 at 3. In 2012, Wilson "gave Patrick a handout to help him understand the important of relieving officers on time, and to help him try and understand how to prioritize some of the calls we receive. Id. at 1.

Two more serious incidents led to a written warning for Vasnaik in May of 2011. One of the "core" responsibilities of the security guards at Providence was to monitor so-called "stand by" patients—patients thought to be in immediate danger of harming themselves or others due to mental illness. Def. Mot. Ex. 24, ECF No. 19-16, at 2; Vasnaik Depo., ECF No. 19-1, at 46. The primary function of a security guard assigned to stand by duty is "remain vigilant in providing watch over the patient" to ensure he or she does not leave hospital grounds. Def. Mot. Ex. 24, ECF No. 19-16, at 2. On April 26, 2011, Vasnaik was assigned to guard a stand by patient, but a technician walked right past him and moved the patient without him noticing; he was using a

computer in the area and admits that he failed to maintain appropriate attention. Def. Mot. Ex. 29, ECF No. 19-20 at 1–4; Vasnaik Depo., ECF No. 19-1, at 57–58.

Shortly thereafter, Vasnaik again violated security procedures when he walked away from a marked patrol vehicle with the keys in the ignition and the engine running. Def. Mot. Ex. 29, ECF No. 19-20, at 1, 3; Vasnaik Depo., ECF No. 19-1, at 60.

Those incidents, along with Vasnaik's May 2011 "No Show/No Call" resulted in a written warning and a "Work Plan for Improvement" that included performance standards for attendance, vehicle usage, and prioritizing calls. Def. Mot. Ex. 30, ECF No. 19-21; Ex. 31, ECF No. 19-22. Vasnaik admitted that his conduct violated Providence policies, and that the written warning and work plan he received were reasonable. Vasnaik Depo, ECF No. 19-1, at 61–62; ECF No. 32-1, at 2.

Vasnaik's final violation of Providence policy resulted in his termination. On September 3, 2012, he parked his personal vehicle in the West Parking Structure, which is reserved for patients and visitors. Vasnaik Depo., ECF No. 19-1, at 72–73. Since it was Labor Day, the area was essentially empty. Id. at 76. It is against Providence's Parking Policy for staff to park in patient and visitor spaces, which includes portions of the West Parking Structure, at any time. Def. Mot. Ex. 41, ECF No. 19-29, at 4. When Mullen later interviewed him about the incident, Vasnaik stated he parked there because he was running late, though he later claimed to have done so because of an injured knee. Def. Mot. Ex. 44, ECF No. 19-29, at 1; Wilson Depo., ECF No. 28-22, at 8–9. There is an exception to the parking policy whereby employees with a temporary disability and the proper permit can park in any designated disabled parking space regardless of its location on the Providence campus. Def. Mot. Ex. 41, ECF No. 19-29, at 2.

Vasnaik did not have such a permit, nor did he seek the assistance of Providence's Employee Health Services department to obtain one. Vasnaik Depo., ECF No. 19-1, at 75-78.

After Mullen investigated the parking incident, he concluded Vasnaik should be discharged, and Providence terminated him on September 17, 2012. Def. Mot. Ex. 44–45, ECF Nos. 19-29, 19-30. The termination letter referenced the policy violations which precipitated Vasnaik's 2011 written warning, "on-going coaching and counseling about [Vasnaik's] failure to demonstrate sound judgment and meet performance standards," and the September 3 parking incident. Def. Mot. Ex. 45, ECF No. 19-30.

While working for Providence, Vasnaik reported to employee health services four knee injuries of varying severity. On July 16, 2009, Vasnaik suffered and abrasion on his knee while working with an agitated patient. Doyle Decl., Ex. A, ECF No. 28-1. He reported the injury "as a matter of protocol." Id. In June 2010, Vasnaik severely injured his right knee attempting to restrain a psychiatric patient. Doyle Decl., Ex. B, Dkt #28-2. Plaintiff underwent knee surgery and received workers' compensation benefits for the injury, and took nearly seven months of approved medical leave to recover. Compl. ¶ 11. He injured his left knee again on August 30, 2011, while "handling a very aggressive patient." Doyle Decl. Ex. C, ECF No. 28-3. Finally, on September 2, 2012, he suffered a bite to the left forearm and an unspecified left knee injury while attempting to control an agitated psychiatric patient by "tak[ing] her to the ground . . . ." Doyle Decl., Ex. D, ECF No. 28-4. Providence filed a workers' compensation claim for his injury on September 21, 2012, four days after he was terminated. Vasnaik Depo., ECF No. 19-1, at 93.

After his termination, Vasnaik filed the present suit asserting federal and state discrimination claims against Providence based on his race, national origin, age, and on-the-job injuries. Compl. ¶¶ 20-99. Defendants now move for summary judgment on all claims; Vasnaik agreed to not oppose dismissal of his claims for race and national origin discrimination, but opposes summary judgment on his age, disability, and injured workers' discrimination claims. Def. Mot. at 4; Pl. Resp. at 1.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d
1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material
issue of fact implausible, that party must come forward with more persuasive evidence to support
his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986).

DISCUSSION

Vasnaik's remaining claims include (1) age discrimination under the Age Discrimination
in Employment Act (ADEA), 28 U.S.C. § 623; (2) disability discrimination under the Americans
with Disabilities Act (ADA), 42 U.S.C. § 12112; (3) age discrimination under ORS § 659A.030;
(4) injured worker discrimination under ORS § 659A.040; and (5) disability discrimination under
ORS § 659A.112.

A plaintiff in an employment discrimination suit may prevail on summary judgment by
providing actual evidence of discrimination or by using the burden-shifting framework of
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248 (1981). Lowe v. City of Monrovia, 775 F.2d 998, 1005–07 (9th Cir.
1985). "As a general matter, the plaintiff in an employment discrimination action need produce
very little evidence in order to overcome an employer's motion for summary judgment." Chuang
v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1124 (9th Cir. 2000). "The requisite degree of
proof necessary to establish a prima facie case . . . on summary judgment is minimal and does
not even need to rise to the level of a preponderance of the evidence." Schechner v. KPIX-TV,
686 F.3d 1018, 1022 (9th Cir. 2012) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th
Cir. 1994).

The burden-shifting framework requires the plaintiff to first establish a prima facie case of unlawful discrimination; if successful, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 n.16 (9th Cir. 2004). If the defendant does so, the plaintiff must show that the articulated reason is a pretext for discrimination. Id.; Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 658–59 (9th Cir. 2002).

A plaintiff may rely on the McDonnell Douglas burden-shifting framework for Oregon Chapter 659 claims adjudicated in federal court, regardless of whether the jurisdictional basis for the state claim is diversity or supplemental jurisdiction. Dawson v. Entek Int'l, 630 F.3d 928, 934–35 (9th Cir. 2011).

## I. Age Discrimination

Vasnaik alleges that Providence discriminated against him based on his age by subjecting him to greater scrutiny and unfair corrective action, and ultimately terminating him. Pl. Resp. at 13. Primarily, his claim rests on his supervisor's repeated references to "pace" in his written evaluations and verbal coachings. Such criticism, he argues, could be interpreted by a reasonable juror as "veiled discrimination." Pl. Resp. at 13–14. Vasnaik has failed, however, to produce evidence of several elements necessary to establish a prima facie case on this claim, and Providence's motion for summary judgment on Vasnaik's age discrimination claim is granted.

To establish a prima facie case of age discrimination, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through introduction of actual evidence of discriminatory motive or through the McDonnell Douglas presumption. Lowe, 775 F.2d at 1005–07. Under the presumption, a prima facie case of age discrimination requires evidence the plaintiff was: (1) at least 40 years old; (2) performing his job in a satisfactory

manner; (3) discharged; and (4) replaced by a substantially younger employee with equal or inferior qualifications. Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1996).

Vasnaik does not indicate whether he is attempting to rely on actual evidence of discriminatory motive or the McDonnell Douglas presumption, but his age discrimination claim fails either way. He has not offered any evidence, direct or circumstantial, of Providence's discriminatory motive. The ongoing criticism of his "pace" and call prioritization does not explicitly reference his age, which weakens any suggestion that such comments were driven by age-based animus. Compare Branscomb v. Group USA, Inc., 475 F. App'x 134, 136 (9th. Cir. 2012)[1] (statement that employee was "burned out" was not sufficient to show discrimination based on age), with Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (comments that employee "was so old he must have come over on the Mayflower" and "was too damn old to do his job" were evidence of age-based animus), and Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1411 (9th Cir. 1996) (employer's stated desire for "somebody younger for the job" was evidence of age-based animus). Moreover, the Ninth Circuit has rejected statements using "far more suggestive words" as insufficient to support an inference of discriminatory motive. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1284 (9th Cir. 2000) (holding that the employer's use of the word "promotable" by itself did not give rise to such an inference) (citing Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir.1993) (same holding for the phrase "[w]e don't necessarily like grey hair"); Nidds, 113 F.3d at 918–19 ("old timers"); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423 (9th Cir. 1990) ("old-boy network").

References to Vasnaik's "pace" are even more tenuously related to age. Read in context, those criticisms are directed at Vasnaik's inability to recognize the importance of answering

---

[1] The Court may cite to unpublished Ninth Circuit opinions issued on or after January 1, 2007. See U.S. Ct. App. 9th Cir. Rule 36-3(b) and Fed. R. App. P. 32.1(a).

higher priority calls more quickly: "Patrick responds to all situations at one casual pace," his supervisor wrote. "I explained to him the importance of picking up the pace for any emergency call and any call where another officer needs assistance." Def. Mot. Ex. 30, ECF No. 19-2, at 3. That is a far-cry from the examples cited above where an employer hurled age-based insults or overtly refused to hire a candidate because they were looking for "somebody younger for the job." Statements about his "pace" are not, on their own, indicative of any discriminatory animus toward Vasnaik.

Vasnaik argues that, combined with references to pace, circumstantial evidence of unwarranted treatment such as "discipline for acceptable rates of absenteeism," and "imposition of a work plan for minor policy violations" could show Providence's discriminatory motives. Vasnaik is correct that there is no evidence in the record that he actually ever exceeded the allowed number of tardies or absences. But Wilson testified it was policy to initiate "counseling" with any employee who reached the maximum of five such occurrences to help them avoid being "out of compliance." Wilson Depo., ECF No. 32-4 at 8–9. Vasnaik's termination letter does not mention attendance as a reason Providence decided to let him go. Def. Mot. Ex. 45, ECF No. 19-30.  And Vasnaik himself admits that the written warning and work plan were a fair result of the three 2011 incidents where he walked away from a running patrol car, lost track of a stand-by patient, and was a no call/no show for a scheduled shift. Vasnaik Depo., ECF No. 19-1, at 62–63. There is simply not enough evidence, circumstantial or otherwise, to show Providence had a discriminatory motive.

If Vasnaik is relying on the McDonnell Douglas presumption, his claim fails because he does not offer any evidence regarding his replacement. Although this fourth element is flexible "where the discharge occurs in the context of a general reduction in the employer's work force,"

there was no such reduction here. <u>Diaz v. Eagle Produce Ltd. P'ship</u>, 521 F.3d 1201, 1207 n.2 (9th Cir. 2008); <u>Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.</u>, 927 F. Supp. 2d 1030, 1055 n.3 (D. Or. 2012) ("[T]his element is only flexible when the discharge results from a general reduction in work force."). The only relevant evidence in the record about another security officer actually cuts against Vasnaik's case. Mullen testified that he had decided to fire a twenty-seven year old officer for losing track of a stand-by patient, but the employee resigned before he could do so. Mullen Decl., ECF No. 20, at ¶ 5. That tends to support Providence's assertions it did not treat Vasnaik unfairly because of his age—Vasnaik received a written warning in part based on the same violation, and he admitted the written warning was "fair." Vasnaik Depo., ECF No. 19-1 at 62–63. Vasnaik has not produced any other comparator evidence, and without such support for one of the required elements, his claim must fail.

The Court finds no genuine issues of material fact regarding Vasnaik's age discrimination claims, and Providence's motion for summary judgment on those claims is granted.

## II.    Disability Discrimination

Vasnaik's state and federal claims for disability discrimination are similar to his age-discrimination claims: that Providence unfairly subjected him to greater scrutiny, corrective action, and ultimately termination based on his knee injury. Compl. ¶¶ 53–60. He also argues that Providence "failed to identify and implement appropriate reasonable accommodations" for his knee injury. Pl. Resp. at 15. These claims rest primarily on his supervisor's regular coaching about his "pace" responding to emergency or high priority security calls. But Vasnaik does not provide sufficient evidence that his knee injury or injuries met the statutory definition of "disability", and thus does not state the prima facie case for disability discrimination or failure to accommodate.

The ADA makes it unlawful for employers within its scope to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also 42 U.S.C. § 12111(5) (defining employer). To establish a prima facie case of disability discrimination under the ADA, plaintiff must show that he (1) has or is perceived as having a disability; (2) is a qualified individual, and (3) was unlawfully discriminated against because of his disability. Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999). The state and federal standards are identical for disability discrimination. Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001); see also Scott v. Sears, Roebuck & Co., 395 F. Supp. 2d 961, 981 (D. Or. 2005) ("The burden shifting analysis of McDonnell Douglas applies to all claims brought under O.R.S. 659A."); Conley v. City of Lincoln City, No. Civ. 02-216-AS, 2004 WL 948427, at *13 (D. Or. Apr. 20, 2004) (citing cases for the proposition that Oregon courts consistently rely on federal case law interpreting Title VII to interpret Chapter 659).

Under the ADA, an employee is disabled if he or she (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of the impairment; or (3) is regarded as having an impairment. 42 U.S.C. § 12102(1). A 2008 amendment to the ADA instructs courts to construe the definition of disability "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A); Weaving v. City of Hillsboro, 763 F.3d 1106, 1111 (9th Cir. 2014). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not

every impairment will constitute a disability within the meaning of this section." 29 C.F.R.

§ 1630.2(j)(1)(ii).

Vasnaik claims that his "knee injuries constituted a physical impairment that substantially limited one or more major life activities." Compl. ¶ 56.  He contends his "age and knee injuries substantially limited his quickness on his feet." Pl. Resp. at 4. His knee "had severe damages from multiple causes, some of which could never be repaired." Id. at 15. The 2010 torn meniscus he suffered while attempting to restrain a patient was his primary injury, and the surgery to correct it required a seven-month recovery period. Id.; Vasnaik Depo., Dkt. 19-1, at 156. But "even after that recovery period ended," Vasnaik claims that his "knee continued to hamper his mobility and he continued to suffer repeated complications," meaning "[h]is knee impairment constituted a disability . . . ." Pl. Resp. at 15.

The only evidence in the record that Vasnaik cites to support these assertions is an independent medical examination report from June, 20, 2010, before his corrective knee surgery and seven-month medical leave. Id. (citing Doyle Decl. Ex. Y, ECF No. 28-25, at 9–10). Taking that evidence as true, it still does not establish the knee injuries substantially limited any of Vasnaik's major life activity *after* his surgery and recovery. In fact, other evidence in the record suggests the injury, once repaired, did not substantially limit his work or other major life activities. After his surgery and leave, Vasnaik obtained a full release from his physician with no physical restrictions, and he testified that he was able to meet the physical functions of his job at all times. Vasnaik Depo, ECF No. 19-1, at 91, 99, 100.

Vasnaik offers no legal authority for his assertion that "quickness on his feet" is a major life activity the limitation of which could form the basis for a disability. See Pl. Resp. at 15. The ADA includes a long list of "major life activities," including, but not limited to "caring for

oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2). Being "quick on one's feet" does not constitute the same core life activities included in the statute. To the extent Vasnaik's argument implies the knee injury or injuries hampered his mobility, the evidence in the record does not support the conclusion that his mobility was "substantially limited," even considering the 2008 amendments broadening the scope of that language. See, e.g., Voiles v. Reavis, No. 1-CV-1166 JLS BGS, 2014 WL 5092664, at *14 (S.D. Cal. Mar. 3, 2014) (finding plaintiff's mobility was "substantially limited" because a workplace injury required him to wear a solid metal brace to walk at all); Doud v. Yellow Cab Co. of Reno, No. 3:13-CV-00664-MMD, 2014 WL 4302552, at *5 n.5 (D. Nev. Aug. 28, 2014) (finding a substantial limitation where plaintiff lost a leg to cancer and required either a battery-operated scooter or crutches for mobility).

Vasnaik's argument that Providence failed to accommodate his disability fails for two reasons. First, he did not allege a failure to accommodate claim in his complaint. See Compl. ¶¶ 53–60; 92–99. He cannot now, at summary judgment, advance a new legal theory as a basis for recovery. See Patel v. City of Long Beach, 564 Fed. Appx. 881, 882 (9th Cir. 2014); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292–93 (9th Cir. 2000) (explaining that a plaintiff could not proceed with new theory not pled in complaint). Second, his failure to produce evidence that he was substantially limited in a major life activity, i.e. disabled, is fatal to his accommodation claim. See 42 U.S.C. § 12112(b)(5)(A) (prohibiting a covered employer from discriminating "against a qualified individual on the basis of disability" by, among others, "not making reasonable accommodations[.]")

Like his claim for age discrimination, Vasnaik has simply failed to provide sufficient evidence to establish a prima facie claim for discrimination based on a disability or failure to accommodate. Providence's motion for summary judgment is, therefore, granted on Vasnaik's federal and state claims for disability discrimination as well.

### III.    Oregon Injured Worker Discrimination

Finally, Vasnaik alleges Providence terminated him because he applied for and received workers' compensation for an on-the-job injury. Compl. ¶¶ 85–91. Oregon law makes it an "unlawful employment practice for an employer to discriminate against a worker . . . because the worker has applied for benefits or invoked or utilized the procedures" of Oregon's workers' compensation system. ORS § 659A.040. To state a prima facie case for workers' compensation discrimination, Vasnaik must show that he invoked the workers' compensation system, and that Providence discriminated against him in the tenure, terms, or conditions of his employment because of it. Arnold v. Pfizer, Inc., 970 F. Supp. 2d 1106, 1142 (D. Or. 2013) (citing Stanich v. Precision Body & Paint, Inc., 151 Or. App. 446, 457, 950 P.2d 328, 335 (1997), abrogated on other grounds by Barackman v. Anderson, 214 Or. App. 660, 667, 167 P.3d 994, 999 (2007)).

"To show a causal link between plaintiff's use of workers' compensation and any adverse employment action, plaintiff must establish that in the absence of a discriminatory motive, he would have been treated differently." Shepard v. City of Portland, 829 F. Supp. 2d 940, 962 (D. Or. 2011) (citing Holte v. Steiner Corp., Civ. No. 08-1329-AA, 2010 WL 1779965, at *10 (D. Or. Apr. 27, 2010)). Although the plaintiff's evidentiary burden to establish the prima facie case is minimal, Davis v. Tri-Cnty. Metro. Transp. Dist. of Or., No. 3:12-cv-0808-SI, 2014 WL 4425815, at *12 (D. Or. Sept. 8, 2014), mere temporal proximity between the employee utilizing

the workers' compensation system and the employer's action is not, standing alone, sufficient to satisfy the causation element. Shepard, 829 F. Supp. 2d at 962.

There is no dispute that Vasnaik's claim satisfies the first two elements because he invoked the workers' compensation system and was terminated. Vasnaik argues that Providence's discriminatory motive is shown by (1) the close temporal proximity between injury and termination, (2) the increased scrutiny he faced after his 2010 workers' compensation claim, (3) a comment Wilson made about the seven months Vasnaik missed from work because of his surgery under the "unexcused absences" section of his 2011 annual review, and (4) an expressed concern from his supervisor about long-term absences. Pl. Resp. at 16–17.

Working backwards, Vasnaik's vague allegation that Wilson expressed concern over a potential long-term absence presumably references Wilson's deposition testimony where he admits to "tell[ing] Mr. Vasnaik that it would be a drain on the department if he missed work." Wilson Depo., ECF No. 28-22, at 16. What Vasnaik does not account for is the rest of Wilson's testimony on the issue. Wilson explained it was "a general conversation; anybody who's missing work puts a drain on the rest of the staff, trying to find coverage," and that the conversation came up "during one of [Vasnaik's] unexcused absences or tardies, or something," though he could not recall the context more precisely. Id. 38:7–13. Even construing that evidence in Vasnaik's favor, a general comment about missing work does not show or even suggest that Wilson discriminated against Vasnaik because he invoked the workers' compensation system.

The Court finds Vasnaik's argument about Wilson's "unexcused absence" comment on Vasnaik's 2011 annual review equally unavailing. The entire comment states, "Patrick was out for almost 7 months due to a work injury. He has had only 1 unexcused absence since his return." Doyle Decl. Ex. K, ECF No. 28-11, at 2. First, the section is not titled "unexcused

absences," as Vasnaik states. It is the section in which unexcused absences are reported but is titled "Financially Responsible," and is the only section where a supervisor could appropriately comment on employee attendance. See id. at 2. Second, and more importantly, Wilson rated Vasnaik's performance in this area as a "4," which corresponds to ">2 unexcused absences, tardies, or early/late Provtime punches."[2] Id. Vasnaik could not have received a "5" rating, the next-best rating and highest overall, because that is reserved for employees with "No unexcused absences, tardies, or early/late Provtime punches," and Vasnaik does not dispute Wilson's comment that he had "only 1 unexcused absence since his return." Id. The "4" grade was the highest mark Vasnaik received in any category on his 2011 evaluation; it defies logic to suggest a supervisor would simultaneously give an employee strong marks for attendance while admonishing him for a seven-month "unexcused" absence. The record simply does not support the discriminatory inference Vasnaik suggests.

Vasnaik repeats his general allegation that Providence subjected him to "increased scrutiny following his 2010 workers' compensation claim." Pl. Resp. 17. He does not specify which of Providence's acts constituted "increased scrutiny," though elsewhere his briefing focuses on the criticism of his "pace." Pl. Resp. at 4. He claims Providence never criticized his pace before his injury but frequently did so after. Id. But he does not explain, however, how this scrutiny is related to his utilizing the workers' compensation system. See Schoen v. Freightliner LLC, 224 Or. App. 613, 627–28, 199 P.3d 332, 342 (2008) (explaining that the workers' compensation statutes do not provide a remedy if an employer "inflicts emotional distress on the worker, not based on the fact that she filed a workers' compensation claim, but simply because she is injured").

---

[2] Presumably, the performance evaluation should read "<2 unexcused absences . . ." as that would more accurately reflect the stated goal of "minimizing unexcused absences[.]"

Moreover, the Court finds evidence in the record that Providence was unsatisfied with Vasnaik's "pace" before his injury. Vasnaik's 2010 evaluation was prepared in September of 2010, which was after Vasnaik's meniscus injury but before he returned to work. In other words, this evaluation exclusively covers his pre-injury performance. Def. Reply, Ex. 17, ECF No. 32-6; Vasnaik Depo., ECF No. 19-1, at 91; Doyle Decl. Ex. B, ECF No. 28-2. "Patrick needs to be a little more focused on the priority calls," Wilson wrote. "He appears to have one speed in which he does everything and there are those occasions when we need to be able to shift gears and pick up the pace. The safety of co-workers may depend on it." Def. Reply, Ex. 17, ECF No. 32-6, at 4. In another section, Wilson wrote "Patrick needs to improve on independently organizing and prioritizing calls in the proper order. He needs to speed up his pace on calls requiring a higher priority level, I.e. (sic) any call for officer assistance, or any emergency call." Id. at 11. Wilson offers an illustrative example:

> When called by Dispatch on June 6, 2010 for a State 10-38 (officer assistance), Patrick replied "10-4, umm, 10-34 room number 917; Nine level." This is an area check we do for IV therapy when we have the time to do it. It does not take priority over other calls.

Id. Wilson continued: "Any stat officer assistance call takes priority followed closely by any emergency code call. The pace needs to be picked up and not casually walked to the call." Id. Admittedly, this example incident happened four days after Vasnaik tore his meniscus. See Doyle Decl., Ex. B, ECF No. 28-2. But it is consistent with Wilson's criticism of Vasnaik's work dating back to July of 2009, when Wilson wrote on his annual review that Vasnaik "could use a little work in prioritizing calls he responds to . . . ." Doyle Decl. Ex. J, ECF No. 28-10, at 11.

Further evidence that Vasnaik's problems with "pace" pre-dated his work injury is a documented meeting between Wilson and Vasnaik on January 18, 2011. Wilson wrote:

[I] spoke with Patrick about **some issues he seemed to have prior to his work related injury**, where he just did not seem to know when to pick up the pace. He **responded to all calls with the same reaction time and interest**. I explained to Patrick that we have emergency calls, urgent calls, and non-urgent calls and he needs to respond accordingly, picking up the pace for each call higher in urgency. I gave him some examples of call responses, which were actually pulled from actual events I witnessed him with (sic) prior to the last time he worked before his injury. I told him what has happened and what we expect; if any call for service comes, he needs to respond immediately. He doesn't necessarily need to run to calls which are not codes, but he does need to start moving in in the direction of the call.

Examples of the above:
1. When he is speaking to someone in the office about a lost and found item and an officer is in the ED calling for backup, you need to ask the people in the office to step out and wait until you return.
2. On his way to MOB to pick up lost and found and a stat call to 5-East comes through, don't continue to the MOB to get the lost and found item first, go ahead and respond to the urgent call.

I told Patrick if ever there are times he is not sure which call to continue on, he needs to get on the radio and ask either myself or a lead officer which one.

Def. Mot. Ex. 18, ECF No. 19-13 (emphasis added). This exhibit shows Vasnaik's trouble prioritizing calls and responding to emergencies with sufficient "pace" pre-dated his 2010 work-related injury, and Providence's continued criticism was not motivated by some discriminatory animus based on his utilizing the workers' compensation program.

That leaves Vasnaik's argument that the temporal proximity between his injury on September 2, 2012 and termination on September 17 could support an inference that he was terminated because he invoked the workers' compensation system. Providence's primary argument here is that it made the decision to terminate Vasnaik on September 14, 2012, before it knew of his workers' compensation claim. Def. Mot. Ex. 44, ECF No. 19-29. at 1–2. Neither party disputes Vasnaik was injured on September 2, 2012, while attempting to restrain a

psychiatric patient, or that Providence certainly knew of his workers' compensation claim by September 17, 2012. Pl. Resp. Ex. D, ECF No. 28-4;  The precise date Providence formally filed his workers' compensation claim is unclear, but inapposite: "Invoke, as used in ORS 659A.040, includes, but is not limited to, a worker's reporting of an on-the-job injury *or a perception by the employer that the worker has been injured on the job or will report an injury*." Herbert v. Altimeter, Inc., 230 Or. App. 715, 726, 218 P.3d 542, 548 (2009) (internal quotation marks omitted) (citing Or. Admin. R. 839-006-0105(7)).

When construed in Vasnaik's favor, the evidence could suggest to a reasonable juror that he invoked the workers' compensation system before Providence decided on September 14, 2012, to terminate him. First, Vasnaik provides as undated work injury report that states he *worked* on September 13, 2012, and "*[p]lans to be seen* at Tanasbourne Occ[upational] Health Clinic 9/17." Doyle Decl. Ex. F, ECF No. 28-5 (emphasis added). The relevant inference to draw, then, is that the document was created sometime between September 13, 2012, and September 17, 2012. The Providence-generated report also features a check box indicating a "Yes" under the option for "Notified Supervisor." Id.

Second, testimony from Vasnaik's supervisor suggests he may have known of Vasnaik's knee injury before the decision to fire him was made. Wilson mentioned a conversation between him and security department manager Mullen regarding Vasnaik's conflicting reasons for parking in the patient-only zone. Originally, Mullen told Wilson, Vasnaik "said that he was running late and that's why he parked there; and then later he changed it to be parked there because his knee was bothering him." Wilson Depo., ECF No. 28-22, at 8–9. Wilson does not say when Mullen told him that information or how Mullen knew it, but viewing the evidence in

the light most favorable to Vasnaik, a reasonable juror could infer that Wilson and Mullen knew his about his knee injury prior to deciding to terminate him on September 14, 2012.

That knowledge, combined with the close temporal proximity between Vasnaik's invoking the workers' compensation system and termination is sufficient to establish the causation element of the prima facie case of workers' compensation retaliation. Dickison v. Wal-Mart Stores, Inc., No. 06-cv-10-AA, 2007 WL 1959287, at *3 (D. Or. July 2, 2007) (quoting Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)) ("Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.").

But that is not the end of the Court's analysis. Under the McDonnell Douglas framework, the burden now shifts to Providence to provide a legitimate, nondiscriminatory reason for terminating Vasnaik. Id. (citing Yartzoff, 809 F.2d at 1376). Providence asserts that the reason it discharged Vasnaik was his repeated violations of Providence employee policy. Def. Mot. at 25. Immediately prior to his termination, Vasnaik was on a work plan for improvement after receiving a written warning for three serious policy violations: failing to maintain attention to a stand-by patient, walking away from an unsecured patrol car, and a no-call/no-show. Vasnaik then violated Providence policy by parking in the patients-only lot, which Providence asserts was the final incident resulting in Vasnaik's termination. Def. Mot. at 10. Providence has, therefore, carried its burden to produce evidence of a legitimate, nondiscriminatory reason for discharging Vasnaik.

The burden now shifts back to Vasnaik to provide evidence that Providence's reasons for termination are merely pretext for discrimination. Dickison, 2007 WL 1959287, at *3. A plaintiff

can establish "pretext" in two separate ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Cornell v. N. Wasco Cnty. Sch. Dist. No. 21, No. 03:10-CV-00964-PK, 2012 WL 4595341, at *3 (D. Or. Oct. 2, 2012) (quoting Chaung v. Univ. Ca. Davis Bd. of Trs., 225 F.3d 1115, 1127 (9th Cir. 2000)). The plaintiff in a discrimination case may "survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reason." Chuang, 225 F.3d at 1127 (9th Cir. 2000). Moreover, the Ninth Circuit holds that summary judgment is "generally unsuitable in [discrimination] cases in which the plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination." Dickison, 2007 WL 1959287 at *3 (quoting Yartzoff, 809 F.2d at 1377.

     Vasnaik contends that Providence's legitimate, non-discriminatory reasons for terminating him are pretextual because "a careful review of Vasnaik's performance record shows that most of those performance problems were imagined or fabricated, or simply did not fit into any pattern of error." Pl. Resp. at 14. Additionally, Vasnaik argues that "Providence's primary criticism of [him]—that he was too slow—could be found by a reasonable juror to constitute veiled discrimination." Id.

     Although there is no dispute that Vasnaik had received a written warning, and that he admits the underlying incidents were true, the Court finds a reasonable juror could interpret the evidence Vasnaik has produced as indicative of a discriminatory intent. Vasnaik testified that he felt "singled-out on this particular incident . . . [b]ecause management as well as the manager of

security and the supervisors are very . . . aware that a lot of people do park there." Vasnaik Depo., ECF No. 19-1, at 107. The parking incident in September of 2012 happened more than a year after Vasnaik received his written warning in May of 2011. And while there is one documented incident in the interim where Warden discussed proper radio usage with Vasnaik, the other evidence in the record suggests he was performing satisfactorily. During his 2012 evaluation, which occurred about two months prior to his termination, Mullen's overall rating of Vasnaik's work was "Meeting Expectations." Def. Mot. Ex. 33, ECF No. 19-23, at 5. Mullen also wrote to Vasnaik:

> [Y]ou bring to our department a reliable, knowledgeable and experienced skill set. In the assessment of Supervisor Wilson, opportunity exists to fine-tune a couple of relatively simple attributes to develop an improvement that can enhance your proficiency and quality. We appreciate your continual contribution and want to enhance what you already have. Additionally, your demeanor and appearance is an outstanding professional representation of our department. With your efforts and the support of Steve, I am certain of your total success.

Id. at 4.

The close temporal proximity between Mullen's positive review, Vasnaik's injury, and his termination could lead a reasonable juror to conclude that Providence's proffered reason for terminating him—that he parked in an essentially empty patient parking lot during the Labor Day weekend—was pretextual. Accordingly, Providence's motion for summary judgment on Vasnaik's ninth claim for relief is denied.

//

//

//

//

//

CONCLUSION

Based on the foregoing, defendant's motion for summary judgment [19] is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge